IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| QUIK PAYDAY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-2203-JWL |
| | ) | |
| JUDI M. STORK, in her official capacity as | ) | |
| Acting Bank Commissioner, and | ) | |
| KEVIN C. GLENDENING, in his official | ) | |
| capacity as Deputy Commissioner of the | ) | |
| OFFICE OF THE STATE BANK | ) | |
| COMMISSIONER, STATE OF KANSAS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## **MEMORANDUM AND ORDER**

This case arises out of sanctions imposed on Quik Payday, Inc., a Utah company

offering short-term, "payday" loans over the internet, by the Kansas Office of the State

Bank Commissioner (OSBC), relating to loans made by plaintiff to Kansas consumers.

In its present action against OSBC officials for declaratory and injunctive relief pursuant

to 42 U.S.C. § 1983, plaintiff alleges that Kan. Stat. Ann. § 16a-1-201—the provision

of the Kansas Uniform Consumer Credit Code (UCCC) that authorized the OSBC's

regulation of plaintiff with respect to those loans—and its application by the OSBC to

plaintiff violate the dormant Commerce Clause and the Due Process Clause of the United

States Constitution.[1]

This matter is presently before the Court on the parties' cross-motions for summary judgment. For the reasons set forth below, the Court concludes that the statute and its application to plaintiff do not violate either the Commerce Clause or the Due Process Clause. Accordingly, the Court grants defendant's motion for summary judgment (Doc. # 38) and denies plaintiff's motion for summary judgment (Doc. # 36), and judgment is entered in favor of defendants on all claims.

## I.    **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006).

---

[1]In its complaint, plaintiff challenges the constitutionality of the OSBC's decision to regulate plaintiff under the Kansas UCCC, but it does challenge specifically any particular sanction imposed by the OSBC. Accordingly, the propriety of any particular sanction is not before the Court.

## II.   Facts[2]

From May 2001 to January 2005, plaintiff's sole business was to provide unsecured, short-term "payday" loans to consumers by way of the internet.  Plaintiff was registered with Utah's regulatory authorities to provide such loans in accordance with Utah law.  Plaintiff's offices were in Utah; plaintiff did not have any offices, employees, or other physical presence in Kansas.  During this period, plaintiff made a total of 3,079 payday loans to 972 consumers who provided a Kansas address on their applications ("Kansas consumers").  Plaintiff loaned a total of $967,550.00 to the Kansas consumers, and collected a total of $485,165.00 in finance charges or fees on those loans.

Some of the Kansas consumers discovered plaintiff by way of an internet search.  Others were solicited by a third-party "lead generator", who would then gather information and forward the applications to plaintiff in Utah.  In addition, some consumers who had previously borrowed from plaintiff received e-mail solicitations directly from plaintiff.  After plaintiff approved the loans, the consumers would then typically transmit the loan contract with their electronic signatures to plaintiff, who would then complete the execution of the contracts in Utah (although a few consumers executed the contract by facsimile).  Plaintiff would then deposit the loan proceeds into the consumers' bank accounts, including accounts in Kansas banks.  In the event of default, plaintiff's representatives or a third-party collection agency would direct e-mails,

---

[2]The parties have stipulated to the facts to be considered by the Court in ruling on these motions.

letters, and/or telephone calls into Kansas to seek repayment.  Plaintiff never brought legal action in Kansas relating to a loan to a Kansas consumer.

Plaintiff did not seek a license from the Kansas OSBC pursuant to the UCCC.  To obtain such a license, a lender must complete a short application; pay an application fee of $425 (with annual renewal fee of $325); obtain a surety bond, which would cost approximately $500 per year; and submit to a background and credit check.

The OSBC began investigating plaintiff after receiving a single complaint from a Kansas consumer in June 2005.  On March 13, 2006, the OSBC issued to plaintiff, pursuant to the UCCC, a Summary Order to Cease and Desist, Pay Civil Penalty (Fine), to Bar from Future Application for Licensure, and to Pay Restitution for Violations.  The Summary Order alleged that plaintiff made supervised loans without first having obtained a license as required by the UCCC.[3]

Plaintiff timely sought a hearing with the OSBC.  In addition, on May 19, 2006, plaintiff filed the instant action against defendants seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that Kan. Stat. Ann. § 16a-1-201 of the UCCC is unconstitutional on its face and as applied to plaintiff by the OSBC, in violation of the Commerce Clause and the Due Process Clause.  The administrative

---

[3]The parties did not identify any other terms of the Summary Order in the stipulated facts upon which the cross-motions are to be decided, nor did they include the Summary Order among the documents listed in the stipulation as available for the Court's consideration.

proceedings were then stayed pending the outcome of this suit.[4]

### III.    Commerce Clause

Plaintiff's payday loans to Kansas consumers fall subject to the Kansas UCCC, including its licensure requirement and other lending regulations, by virtue of Kan. Stat. Ann. § 16a-1-201.  That statute provides as follows:

> (1)   Except as otherwise provided in this section, K.S.A. 16a-1-101 through 16a-9-102 [the Kansas UCCC], and amendments thereto, apply to consumer credit transactions made in this state.  For purposes of such sections of this act, a consumer credit transaction is made in this state if:
>
> . . .
>
> > (b) the creditor induces the consumer who is a resident of this state to enter into the transaction by solicitation in this state by any means, including but not limited to:   Mail, telephone, radio, television or any other electronic means.
>
> . . .
>
> (6)  For the purposes of [the UCCC], the residence of a consumer is the address given by the consumer as the consumer's residence in any writing signed by the consumer in connection with a credit transaction.  . . .

*Id.* (1)(b), (6).  Plaintiff asserts that this statute and its application by the OSBC to plaintiff violate the Commerce Clause of the United States Constitution.

"The dormant implication of the Commerce Clause prohibits state regulation that

---

[4]On September 26, 2006, the Court denied defendants' motion to dismiss based on the doctrines of standing, ripeness, and exhaustion.  *See* Memorandum and Order (Doc. # 16).

discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *ACLU v. Johnson*, 194 F.3d 1149, 1160 (10th Cir. 1999) (internal quotations omitted) (quoting *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997)).  Relying on the Tenth Circuit's opinion in *Johnson*, plaintiff asserts that section 16a-1-201 violates the Commerce Clause in three ways:   (1) it constitutes an unreasonable and undue burden on interstate commerce under the *Pike* balancing test; (2) it regulates conduct occurring wholly outside of Kansas; and (3) it subjects internet payday lending to inconsistent state regulation.  *See id.* at 1160-61. These three bases for invalidation under the Commerce Clause are addressed in turn.

### A.   Pike *Balancing Test*

In *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), the Supreme Court set forth the following balancing test for use in applying the dormant Commerce Clause:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* at 142 (citations omitted) (quoted in *Dorrance v. McCarthy*, 957 F.2d 761, 763 (10th Cir. 1992)).  "The person challenging a statute that regulates evenhandedly bears the burden of showing that the incidental burden on interstate commerce is excessive

compared to the local interest." *Dorrance*, 957 F.2d at 763 (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).

Plaintiff contends that the burden on interstate commerce created by Kansas's regulation of out-of-state internet payday lenders clearly exceeds the benefits afforded by such regulation.  Plaintiff argues that it could not stay in business if it had to comply with regulations in every state in which its borrowers were located, and that internet payday loan business would be driven out of the country.  Plaintiff further argues that the local benefits of such regulation are not great because consumers are actually harmed by limiting lenders' ability to do business in Kansas through regulation, thereby limiting access to credit, and because it is already subject to regulation in its home state of Utah.

The Court agrees with defendants that this issue is controlled by the Tenth Circuit's opinion in *Aldens, Inc. v. Ryan*, 571 F.2d 1159 (10th Cir. 1978).  The plaintiff there, Aldens, was an Illinois mail-order house that solicited business in Oklahoma by mailing catalogues and flyers to Oklahoma residents.  *Id.* at 1160-61.  Aldens had no physical presence in Oklahoma, and all orders and credit applications were accepted in Illinois.  *Id.* at 1161.  The finance and credit charges imposed by Aldens conformed with Illinois and federal law, but its interest rates exceeded those allowed by the Oklahoma Consumer Credit Code, which applied by its terms to mail-order solicitation, sales, and the extension of credit in Oklahoma.  *Id.*

Aldens brought suit, alleging that the application of the Oklahoma Code to its mail-order business violated the Commerce Clause and Due Process Clause.  *Id.* at 1160.

7

The Tenth Circuit rejected those challenges, following and citing with approval the opinions of the Third Circuit and Seventh Circuit in cases involving Aldens's mail-order business with consumers in other states. *Id.* at 1161-62 (citing *Aldens, Inc. v. Packel*, 524 F.2d 38 (3d Cir. 1975) and *Aldens, Inc. v. LaFollette*, 552 F.2d 745 (7th Cir. 1977)).

The Tenth Circuit applied the Supreme Court's balancing test, and held that "a conformance with the Oklahoma cost of credit rules would not constitute an undue burden on interstate commerce." *Id.* at 1162. The court noted that there would be a burden on Aldens "to sort out the Oklahoma credit transactions, and accord them somewhat different treatment." *Id.* The court further noted that, according to the stipulated facts, it would cost Aldens approximately $160,500 per year in processing costs and reduced finance charges (on gross sales in Oklahoma of $2,250,000) to comply with the Oklahoma regulations. *Id.* at 1161-62. Nevertheless, the court held that that burden did not outweigh Oklahoma's interest in "the cost of credit for goods sold to its residents." *Id.*

The Third Circuit, in the opinion cited with approval by the Tenth Circuit, elaborated somewhat in the application of the balancing test. *See Aldens, Inc. v. Packel*, 524 F.2d at 47-50. The Third Circuit identified the fundamental issue as "whether the national interest in the free movement of money, credit, goods and services outweighs the valid local interest in restricting maximum interest rates on consumer 'loans' and setting uniform contract terms for such transactions." *Id.* at 47-48. The court resolved that issue as follows:

8

> Before the emergence of a national currency and a national monetary policy, and especially before the emergence of national concern over consumer protection in interstate commerce, the issue would not have been seriously debated.  But even in the period since these developments, no case that we have been referred to has even so much as hinted that usury laws and related contract laws are not appropriate matters for local regulation.  This despite the facts that such laws do burden interstate commerce, and that the burden is increased by the lack of uniformity.  Considering, however, the historical recognition that the states may, despite the burden on commerce, enact varying usury laws and varying contract laws, any judgment that the present proliferation of regulations of consumer credit transactions has burdened commerce unduly must be made by Congress.  Here the legislative judgment made in § 1610(b) of the Truth in Lending Act[5] once more becomes significant.  Congress has deferred to the states on the matter of maximum interest rates in consumer credit transactions.  Since it has done so we decline to hold that the burden imposed by Pennsylvania on Aldens' interstate commerce by virtue of [the applicable Pennsylvania statute] is so great that it outweighs the Commonwealth's interest in regulating the rates which its resident consumers may pay for the temporary use of money or the terms on which they may contract for such sale.

*Id.* at 48-49 (footnote omitted); *see also Aldens, Inc. v. Ryan*, 571 F.2d at 1162 (following the decisions of the Third and Seventh Circuits in applying the balancing test).

The Court concludes that plaintiff's internet payday loan business easily fits within the courts' analysis and rationale in the *Aldens* cases.  The Tenth Circuit has concluded that a state's regulation of the cost and terms on which its residents borrow money from an out-of-state creditor is not outweighed by the burdens on interstate

---

[5]This section provides that the federal Truth in Lending Act does not affect state laws relating to permissible rates or elements for credit transactions.  *See* 15 U.S.C. § 1610(b).

commerce, including the burden of a cost to a particular creditor of $160,500 per year. The only evidence contained in the parties' stipulated facts reveal that it would cost plaintiff less than $1,000 per year to comply with Kansas's licensure requirement. Although plaintiff complains that it would suffer administrative burdens as well to ensure compliance with Kansas law on its loans to Kansas consumers, there is no evidence of what those costs might be. Plaintiff also argues that the burdens of complying with every state's consumer lending laws would be great and would effectively eliminate its ability to do business. Again, however, plaintiff has provided no evidence to support that allegation. Nor has plaintiff shown that it is in fact subject to regulation in other states. At any rate, the existence of any such additional burden does not distinguish the present case from the *Aldens* cases. Plaintiff has not established a burden nearly as onerous as the burdens permitted in *Aldens*. Accordingly, the Court follows the Tenth Circuit in rejecting this Commerce Clause challenge based on the *Pike* balancing test.

Plaintiff attempts to distinguish the Tenth Circuit's decision in *Aldens* by noting that the Oklahoma regulations did not require that Aldens be qualified to do business in Oklahoma, while plaintiff must become licensed under Kansas law. Thus, plaintiff argues that its burdens are greater. As noted above, however, the cost of obtaining and maintaining a license is less than $1,000 per year, and plaintiff has not explained how the license requirement imposes a significantly greater burden than would mere compliance with the other applicable regulations.

Plaintiff also argues that while the mail-order business had a lot of contacts with Oklahoma, plaintiff merely maintains a website and therefore has no contacts with the state of Kansas.  This argument ignores the requirement of the Kansas UCCC that, for its loans to be subject to regulation, plaintiff must have solicited business in Kansas.  The stipulated facts also show that plaintiff had contacts with Kansas consumers in its collection activities.  Thus, the court cannot agree that plaintiff had significantly fewer contacts with the regulating state than Aldens had.  Moreover, the number or type of such contacts played no role in the *Aldens* courts' decisions; to the contrary, the Tenth Circuit specifically rejected any arguments based on the "presence" concept or the place of sale, delivery, contract, or performance.  *Aldens, Inc. v. Ryan*, 571 F.2d at 1161.[6]

The Tenth Circuit's *Pike* analysis in *Johnson*, on which plaintiff relies, is easily distinguished.  *Johnson* and the case whose reasoning it adopted, *American Libraries Ass'n v. Pataki*, involved state statutes that criminalized the dissemination of material harmful to minors over the internet.  *See Johnson*, 194 F.3d 1149; *Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997).  Because that conduct was not specific to the particular states, regulation would have had a drastic chilling effect on lawful conduct, thereby imposing

_____

[6]Amicus Online Lenders Alliance (OLA) tries to distinguish *Aldens* by arguing that that case involved sales to discrete locations, while the internet can be accessed from anywhere, including out-of-state.  Again, however, the regulation requires solicitation specifically in Kansas, which provides sufficient contacts with the state.  Pinpointing a specific location within the state is not relevant to the analysis.  In addition, once a consumer submitted an application to plaintiff, that consumer's very discrete address in Kansas became known to plaintiff, who then accepted the loan and subsequently directed collection activities specifically to that location.

an extreme burden on interstate commerce.  *See Johnson*, 194 F.3d at 1161-62; *Pataki*,

969 F. Supp. at 177-81.  Those courts also noted that the local benefits of the regulation

were not especially great.   *See Johnson*, 194 F.3d at 1161-62; *Pataki*, 969 F. Supp. at

177-81.  In this case, however, plaintiff's conduct is only subject to regulation in Kansas

if it solicits in Kansas and then makes a loan to a Kansas consumer.  Regulation of that

specific conduct would not have any significant chilling effect on plaintiff's ability to

conduct business in other places—if plaintiff cannot or will not comply with Kansas law,

it need only refrain from making loans to persons who have applied with a Kansas

address.  *Johnson* does not govern this case simply because the internet is involved in

each case.  The burden on interstate commerce in this case does not approach the

extreme burden present in *Johnson*.  Moreover, the Tenth Circuit has specifically noted

the states' interest in regulating consumer credit and lending, again distinguishing the

present case from *Johnson*.

Finally, plaintiff cites *Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280 (8th

Cir. 1993), in which the Eighth Circuit ruled that Missouri's regulation of an out-of-state

lender's business conducted in Missouri violated the Commerce Clause under the *Pike*

balancing test.  *Id.* at 283-85.  That case is easily distinguished from the present case on

two counts.  First, in *Pioneer* the state's stated purpose in protecting its citizens from

lending abuses was illusory because the lender had made loans only to *non-residents*

who were stationed in Missouri.  *Id.* at 284.  In the present case, plaintiff's borrowers

have identified themselves as Kansas residents, and the Tenth Circuit recognized in

*Aldens* that a state has an interest in protecting loans to its citizens. Second, the lender in *Pioneer* provided evidence that its cost to comply with the regulations, which required an in-state office, would exceed $210,000, and that it would therefore be unable to maintain any profitable business in Missouri. *Id.* at 282. Plaintiff has provided no such evidence in the present case, and therefore plaintiff has not met its burden of showing that the burdens on interstate commerce clearly outweigh the local benefits here. This case aligns much more readily with *Aldens*, and the Court therefore reaches the same conclusion reached by the Tenth Circuit in that case.

###### B.    *Conduct Occurring Wholly Outside Kansas*

For its second basis, plaintiff argues that its regulation under the Kansas UCCC violates the Commerce Clause because the OSBC is regulating conduct occurring wholly outside the state of Kansas. Plaintiff argues that it had no physical presence in Kansas; that the loans were accepted (and, under Kansas choice-of-law principles, the contracts were therefore made) in Utah; and that the business was conducted over the internet, which defies concepts of geography such as state lines. Plaintiff argues that the use of this electronic medium is key, and that by using the internet, it does not do business in Kansas or in any particular state, but rather it does business across the country generally. Plaintiff again relies on *Johnson*, in which the Tenth Circuit invalidated a state law under the Commerce Clause on this basis. *See Johnson*, 194 F.3d at 1161-62.

This argument is easily rejected for the reason that plaintiff's conduct did not

13

occur wholly outside of Kansas.  In *Johnson*, the state regulation would have reached the conduct of placing something on the internet in another state that was not directed towards anyone in or related to the regulating state; thus, the statute would reach conduct occurring wholly outside the regulating state.  *See id.*  In this case, the regulated conduct by plaintiff was not an act that applied to and affected persons in a number of states at the same time; rather, the regulated conduct related specifically to the state of Kansas. Accordingly, it cannot be said that plaintiff's conduct occurred wholly outside of Kansas.

First, the regulation at issue requires a loan to a Kansas resident.  The fact that the loan is "made", for choice of law purposes, in Utah is irrelevant.  The Kansas UCCC provides explicitly that a consumer credit transaction is "made" in Kansas if it is with a Kansas resident and induced by solicitation in Kansas.  Kan. Stat. Ann. § 16a-1-201(1)(b).  Moreover, in *Aldens*, the Tenth Circuit noted that a state may regulate "the consequences of commercial transactions on its citizens which arise or are directed from outside its borders," while expressly rejecting any reliance on the "presence" concept or the place of sale, delivery, contract, or performance.  *See Aldens, Inc. v. Ryan*, 571 F.2d at 1161.  The Court also agrees with the following reasoning of the Third Circuit in rejecting a Commerce Clause claim under this test:

> [C]ontracts formed between citizens in different states implicate the regulatory interests of both states.  Thus, when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract.

*A.S. Goldmen & Co. v. New Jersey Bur. of Securities*, 163 F.3d 780, 787 (3d Cir. 1999);

*accord Cambridge Credit Counseling Corp. v. Foulston*, 303 F. Supp. 2d 1188, 1196 (D. Kan. 2003) (quoting *A.S. Goldmen* in rejecting same Commerce Clause argument); *see also People v. Fairfax Family Fund, Inc.*, 47 Cal. Rptr. 812, 815 (Cal. Dist. Ct. App. 1965) ("To argue that defendant is not doing business in California, but engaged only in interstate commerce is to completely ignore the facts of life and reality."). Thus, plaintiff's entering into loan contracts specifically with Kansas citizens does not represent conduct occurring wholly outside Kansas.

Plaintiff also directed collection activities into Kansas, and those activities are also regulated by the Kansas UCCC. For that reason as well, the regulated conduct does not occur wholly outside of Kansas.

Plaintiff points to the hypothetical situation in which a Kansas consumer accesses its website and completes the transaction with plaintiff while using a computer outside Kansas. Plaintiff has not provided any evidence, however, that that actually occurred with respect to any of its loans to Kansas consumers. Moreover, regulation of plaintiff's loans to Kansas consumers under section 16a-1-201 also requires specific conduct in Kansas—solicitation by plaintiff in Kansas resulting in the loan transactions.

Amicus OLA argues that a lender soliciting by e-mail cannot tell whether the recipient is in fact in Kansas. The Kansas UCCC does not regulate mere solicitation, however; rather, it regulates loans induced by solicitation in Kansas. Once plaintiff received a loan application with a Kansas address, plaintiff had notice that a loan to that consumer was subject to regulation in Kansas unless the loan was not in fact induced by

15

solicitation in that state. Unlike the regulation in *Johnson*, there is no chilling effect here—plaintiff was not prevented or deterred or discouraged from soliciting or doing business with residents of states other than Kansas.

Certainly, under the hypotheticals posited by plaintiff and amicus, one might question whether the resulting loan was actually induced by solicitation in Kansas; however, the issue of whether any particular loan satisfied the requirements of Kan. Stat. Ann. § 16a-1-201, thereby subjecting the loan to regulation under the Kansas UCCC, is not before the Court in this case.[7] The only issue is whether that statute, on its face or as applied, violates the Commerce Clause or Due Process Clause. The statute requires a loan with a Kansas resident induced by solicitation in Kansas. Therefore, either on its face or as applied to plaintiff, the statute does not regulate conduct occurring wholly outside Kansas, and this basis for invalidation under the Commerce Clause is rejected.

## C.     *Inconsistent State Regulation*

Finally, plaintiff argues that its regulation in Kansas violates the Commerce Clause because it subjects internet payday lending to inconsistent state regulation. *See Johnson*, 194 F.3d at 1161, 1162. Plaintiff notes that the states have differing

---

[7]Defendants have agreed that "solicitation in Kansas" under the statute does not include merely maintaining a website that may be accessed from Kansas, and the Court agrees that such an interpretation comports with the reasonable understanding of that language. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982) (in considering a facial challenge to a state law, a federal court must consider any limiting construction proffered by a state enforcement agency).

requirements for payday loans, and it argues that such lending should be subject only to nationally uniform standards.

Once again, plaintiff relies on *Johnson*, *Pataki*, and other internet pornography cases. In *Johnson*, the Tenth Circuit, in conclusory fashion, agreed with the *Pataki* court that the internet, "like rail or highway traffic, requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations." *Id.* at 1162 (quoting *Pataki*, 969 F. Supp. at 182). The *Pataki* court, in its extensive analysis, noted that "[t]he unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed." *Pataki*, 969 F. Supp. at 168. Accordingly, the court concluded that "the Internet is one of those areas of commerce that must be marked off as a national preserve to protect users from inconsistent regulation that, taken to its most extreme, could paralyze development of the Internet altogether." *Id.* at 169. In likening the internet to rail or highway traffic (subjects of commerce found by the Supreme Court to require nationally uniform regulations under the Commerce Clause), the *Pataki* court noted that an internet user cannot foreclose access to its work from certain states and thus cannot effectively bypass any particular state. *Id.* at 181-83.

Based on these cases, plaintiff argues that the Tenth Circuit has recognized that the internet should be subject only to national regulation. Thus, plaintiff argues that any state regulation of the internet payday loan industry violates the Commerce Clause. The

17

Court disagrees.

It is clear that the reasoning of the *Johnson* and *Pataki* courts extends only to regulation of the content of the internet, and does not necessarily invalidate any regulation of commerce conducted over the internet. Instead, plaintiff must show that internet payday lending specifically represents the type of commerce that should only be subject to nationally-uniform standards and not to inconsistent state regulations.

Plaintiff cannot meet this standard. Plaintiff's conduct in making loans to Kansas consumers is not akin to railroad travel or highway travel or merely placing things on the internet. In those other instances, the same conduct could be subject to different and inconsistent regulations at the same time. Plaintiff's regulated conduct consisted of making a loan with a Kansas resident after solicitation in Kansas. That conduct is directed specifically towards a particular state and does not necessarily implicate other states. Plaintiff is not being regulated "by states that [it] never intended to reach and possibly was unaware were being accessed," *Pataki*, 969 F. Supp. at 168, and therefore there is no similar need for nationally uniformity. Internet payday lenders can easily bypass particular states in making loans. The discrete nature of the regulated transactions make the internet payday loan industry similar to the insurance industry or any other industry in which a company must tailor its business to conform to the laws of its customer's state of residence.

In addition, in its *Aldens* case, the Third Circuit rejected this basis for a Commerce Clause violation as applied to the mail-order credit business, again by

reference to the federal Truth in Lending Act and its "express congressional recognition of the appropriateness of a state law role with respect to interest rates in the field of consumer credit." *See Aldens, Inc. v. Packel*, 524 F.2d at 46-47 (citing 15 U.S.C. § 1610(b). The court concluded:

> It might be argued that § 1610(b) may be construed as an express adoption of state law as the appropriate federal standard for measuring interest rates in consumer credit transactions. But even if § 1610(b) is not so construed, at a minimum it is a congressional recognition that the maximum level of interest rates in consumer credit transactions is not a subject requiring a uniform national rule. In face of this express congressional recognition that national uniformity is not required it would not, we suppose, be open to the Court to hold otherwise.

*Id.* (footnotes omitted).

The fact that particular consumer lending activity involves the internet does not change this analysis. The Court agrees with the following reasoning of the Fifth Circuit, which rejected a similar argument under *Pataki* that the need for nationwide uniformity outweighs a state's interest in regulating "e-commerce":

> When considering laws that directly regulate internet activities, this alleged need for uniformity may well prevail. However, application of this principle in circumstances like the instant case would lead to absurd results. It would allow corporations or individuals to circumvent otherwise constitutional state laws and regulations simply by connecting the transaction to the internet.

*Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 504-05 (5th Cir. 2001).

Plaintiff and other internet payday lenders are not in danger of having inconsistent regulations from several states apply to the same transactions. The fact that plaintiff's business involves use of the internet does not change that result. The Court concludes

that Kan. Stat. Ann. § 16a-1-201 and its application to plaintiff do not violate the Commerce Clause under this test.

### D.    Summary

Plaintiff's regulation under the Kansas UCCC does not violate the Commerce Clause under any of the three tests applied by the Tenth Circuit in *Johnson*. Accordingly, defendants are awarded summary judgment on plaintiff's claims under the Commerce Clause, and plaintiff's motion for summary judgment is denied.

### IV.    **Due Process Clause**

Defendants also seek summary judgment on plaintiff's claims under the Due Process Clause.[8]  In its complaint, plaintiff alleged that regulation of internet payday lenders violated the Due Process Clause because the OSBC lacked "jurisdiction" over such activities, because out-of-state lenders do not have a "substantial nexus" with Kansas, and because there are "insufficient contacts between the regulated subject matter and Kansas."  Complaint ¶¶ 33-35, 40 (Doc. # 1).

In *Aldens*, the Tenth Circuit rejected such a claim, holding that "the state's interest in the cost of credit extended for goods sold to its residents is sufficient to overcome due process objections."  *Aldens, Inc. v. Ryan*, 571 F.2d at 1161.  In so doing,

---

[8]Plaintiff has not moved for summary judgment on its due process claims.

the Tenth Circuit rejected any reliance on physical presence in the state or the place of sale or contract or performance. *Id.* As noted above with respect to plaintiff's "extra-territoriality" argument, lenders regulated under Kan. Stat. Ann. § 16a-1-201 necessarily have contacts with the State of Kansas. *See supra* Part III.B. Accordingly, the Court grants summary judgment if favor of defendants on this due process claim.[9]

Defendants also move for summary judgment on plaintiff's claim that Kan. Stat. Ann. § 16a-1-201(1) is unconstitutionally vague with respect to the term "solicitation in this state". Plaintiff addresses this claim only in the final paragraph of its opposition brief. Plaintiff cites the statute's official comment, which notes that "[n]o guidance is given [in the statute] on when a solicitation is made in Kansas or what role any solicitation that is deemed to have been made in Kansas must have played in the consumer's decision to enter into the transaction." *Id.* cmt. (2000). Plaintiff then summarily asserts that this case presents a "textbook violation" of the Due Process Clause's vagueness standard. Plaintiff has not, however, indicated the manner in which the phrase "solicitation in this state" is vague or ambiguous, or how the phrase might reasonably be interpreted in different ways. Nor has plaintiff addressed the cases cited

---

[9]In support of this claim, plaintiff argues only that its regulation proved unfair and unreasonable in light of its limited contacts with Kansas, its regulation by Utah, the existence of only one complaint in Kansas, and the harshness of the OSBC's sanctions. As noted above, plaintiff's complaint does not allege any due process violation based on the particular sanctions imposed by the OSBC under the Kansas UCCC, and therefore the issue is not before the Court. *See supra* note 1. Under the Tenth Circuit's holding in *Aldens*, regulation of internet payday lenders under the Kansas UCCC comports with due process.

in the comment for guidance concerning its scope. *See, e.g., Watkins v. Roach Cadillac, Inc.*, 7 Kan. App. 2d 8, 14-15, 637 P.2d 458, 463 (1981) (holding that consumer protection act provision requiring sales or solicitation in Kansas was not unconstitutionally vague).

At any rate, plaintiff cannot challenge the statute for vagueness because its conduct falls within the statute under any reasonable interpretation. *See Village of Hoffman Estates*, 455 U.S. at 494 ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); *Parker v. Levy*, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). According to the stipulated facts, plaintiff directed e-mail correspondence to some Kansas consumers who had borrowed from plaintiff previously, in order to solicit future loans; and it directed some Kansas consumers to its website after those consumers were referred by a lead generator. This conduct would constitute "solicitation" under any reasonable interpretation. Therefore, plaintiff cannot challenge the statute for vagueness, and defendants are awarded summary judgment on this claim under the Due Process Clause.[10]

_____

[10]Plaintiff did not address any other possible claims or bases for relief in opposition to defendant's motion for summary judgment, and any such other claims are therefore deemed abandoned.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant's motion for summary judgment (Doc. # 38) is granted, and plaintiff's motion for summary judgment (Doc. # 36) is denied, and judgment is entered in favor of defendant on all claims.

IT IS SO ORDERED.

Dated this 7th day of September, 2007, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge